UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KARL GUIDRY, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. H-08-2022 |
| | § | |
| AES DEEPWATER INC., | § | |
| | § | |
| Defendant. | § | |

**OPINION & ORDER**

Pending before the Court is Defendant AES Deepwater, Inc.'s ("AES Deepwater") motion for summary judgment (Doc. 35), as well as Plaintiff Karl Guidry's ("Guidry") response (Doc. 36), Defendant's reply (Doc. 38), and Plaintiff's surreply (Doc. 39). Upon careful review and consideration of this motion, the response, reply, and surreply thereto, the relevant legal authority, and for the reasons explained below, the Court finds that Defendant's motion should be denied.

I. Background and Relevant Facts

This is a race discrimination in employment case. Guidry brings suit for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981. (Doc. 1, ¶ 4.) Guidry, an African-American, alleges that AES Deepwater discriminated against him because of his race. (Doc. 1, ¶ 14; Doc. 35, Exh. 7.)

Defendant AES Deepwater operates a power plant in Pasadena, Texas. (Doc. 36 at 11.) Guidry began working at AES Deepwater as an operator trainee in 1986. (Doc. 1, ¶ 6.) Within his first year, AES Deepwater promoted Guidry to Flue Gas Desulfurization ("FGD") operator. (Doc. 36, Exh. 1 at 63:13–25.) In 1988, AES Deepwater promoted Guidry to FGD lead operator and later to plant technician. (*Id.* at 63:21–34:22.) In 1992, AES Deepwater promoted Guidry to

control room relief operator.  (*Id*. at 67:6–14; Exh. 9.)  After a year as a control room relief operator, in March 1993, AES Deepwater chose Guidry to fill a temporary position in a new training program.  (*Id*. at 69–70.)  AES Deepwater later made the position permanent.  (*Id*. at 72:3–5.)  In February 1996, AES Deepwater assigned Guidry the additional role of plant safety coordinator.  (*Id*. at 73:6–9.)  As part of this job, Guidry wrote five training manuals and developed qualification assessment instruments for AES Deepwater.  (*Id*. at 247–249.)  In 1997, AES Deepwater placed Guidry in an FGD support position.  (*Id*. at 74:12–13.)

In 2003, Leon Ballard ("Ballard"), the plant manager, assigned Guidry to a maintenance support position, a lateral transfer.  (*Id*. at 78:21–23.)  Ballard said Guidry was "the most senior guy in the back end of the plant" and that no one else was "as qualified as [Guidry]."  (Doc. 36, Exh. 2 at 111:24–112:8.)  While serving in the maintenance support position, Guidry applied for a maintenance team leader position.  (Doc. 36, Exh. 1 at 80, 102:2–11.)  That promotion was given to Mehrlie Worthen, a white male hired from outside AES Deepwater.  (*Id.*)  AES Deepwater's administrative procedure policy manual states that "job openings will be posted in the local newspaper . . . if there are no qualified candidates from AES Deepwater."  (Doc. 36, Exh. 7.)  Guidry alleges that this policy was ignored.  (Doc. 36, at 12.)

In January 2005, AES Deepwater promoted Guidry to interim FGD team leader.  (*Id*. at 2; Exh. 1 at 82:9–16.)  Guidry's February 2005 performance evaluation states that his next career move should be to a team leader position in one to two years.  (Doc 36, Exh. 18.)  In May 2005, with nearly fifteen years of FGD experience and eight years in the FGD support role, Guidry applied for another FGD team leader opening.  (Doc. 36, ¶ 18.)  AES Deepwater selected Tracy Jarvis ("Jarvis"), a white employee from another plant to fill that position.  (Doc. 36 at 12.)  Jarvis had prior team leader experience and a college degree.  (Doc. 35 at 3; Doc 36, Exh. 4 at

5:1–8.)  Guidry filled in as interim FGD team leader for three to four months until Jarvis was hired.  (*Id.*; Doc. 36, Exh. 1 at 82:9–17.)

During his tenure with AES Deepwater, Guidry served as an interim team leader on at least four different occasions.  (Doc 36, ¶ 10; Doc 35, Exh. A at 260:7–263:1.)  These interim assignments ranged from a few weeks to a few months.  (*Id.*)  From the pleadings and depositions, it appears that Guidry applied for at least seven, possibly eight, team leader positions during his twenty years with AES Deepwater.  (*Id.*, Exh. 1 at 92:4–6.)  Guidry applied for his first FGD team leader promotion in 1995.  (*Id.* at 92:14–20.)  At the time, AES Deepwater did not fill the position and instead assigned the team leader duties to Robert Johnson, a white male.  (*Id.* at 92:15–93:5.)  In 1999, after serving two years in the FGD support position, Guidry applied for a second FGD team leader position.  (*Id.* at 93:8–12.)  That time, the position went to Rodney Grubham, a white employee from another facility.  (*Id.* at 93:15–94:2.)  In 2000, Guidry applied for a third FGD team leader position.  AES Deepwater again chose not to fill the position.  (*Id.* at 94:9–16.)  AES Deepwater reposted the same position later that year along with a water treatment team leader position.  (*Id.* at 99.)  Guidry applied for both.  (*Id.* at 95:22–24.)  AES Deepwater gave the FGD team leader position to Gregg Ross, a white employee, and the water treatment team leader position to Bill Pogue, who is also white, does not have a college degree, and had worked at AES Deepwater five years fewer than Guidry.  (*Id.* at 99:24–100:5; Doc. 35, Exh. G at 5:10–11.)

On or about December 5, 2006, AES Deepwater posted a job opening for an operations team leader.  (Doc. 36, Exh. 8.)  The position did not require a college degree.  (*Id.*; Doc. 36, ¶ 35.)  Guidry applied for the promotion and in April 2007, AES Deepwater conducted interviews for the position.  (Doc. 1, ¶ 8–10; Doc. 35 at 5.)  As part of the process, two volunteer peer

review groups of four to six employees interviewed three candidates, including Guidry and Jeff McClarty ("McClarty"), a white warehouse clerk.  (*Id.*)  The peer review groups then made recommendations to the plant manager, Jennifer Didlo ("Didlo"), also white, who was responsible for the final hiring decision.  (Doc. 36, ¶ 38, Exh. 3 at 112:8–10.)

The peer review groups that interviewed Guidry were comprised entirely of white employees.  (*Id.* at 180:6–17.)  Two African-Americans, Maria Mathis ("Mathis") and Nathaniel Williams ("Williams"), had volunteered to be on the peer review groups, but were replaced by white employees the day of Guidry's interview.  (*Id.* at 269:22–271.)  According to Guidry, Mathis "was on vacation but intended to participate" when "she received a call telling her that because she was on vacation, she need not come in and participate."  (*Id.* at 273–274.)  Mathis "conveyed that she had committed to being on the teams, and did not have a problem coming in," but was told, "it's okay, we'll find a replacement."  (*Id.* at 274:3–6.)  Williams also wanted to participate, but after his house was broken into, Tracy Jarvis said they would get a replacement.  (*Id.* at 274:21–275:3.)

Jarvis was Guidry's supervisor and also led one of the peer review groups that interviewed Guidry.  (Doc. 36, Exh. 1 at 108:8–14; 128:5–8; Doc. 1, ¶ 10.)  Didlo was aware that Jarvis and Guidry had a history of personality conflicts.  (Doc. 36, Exh. 1 at 129:23–130:6, 134:7–25.)  After the interviews, the peer review groups met with Didlo to give their recommendations.  (Doc. 35 at 6; Doc. 36, Exh. 3 at 135:1–20.)  Didlo claims she did not read the summary sheets from the interviews but did ask for the groups' ratings.  (Doc. 36, Exh. 3 at 135:4–23; 139.)  Didlo could not recall Guidry's ratings.  (*Id.* at 139.)  When asked why she did not write the rating down, she responded, "I don't know why I would need to?"  (*Id.*)

Didlo stated that she did not consider an employee's history with AES Deepwater or look

at personnel files when selecting team leaders.  (*Id*. at 127:21–128:4.)  When asked what she would look for in a resume for the 2007 operations team leader position, Didlo responded, "I have posted many jobs.  I would be speculating if you want to know the specifics of what I was looking for."  (*Id*. at 116:22–117:4.)  Didlo testified that she could not remember whether she interviewed McClarty for the operations team leader position, whether she had spoken with his supervisor regarding his qualifications, or whether McClarty had even submitted a resume.  (*Id*. at 119:20–24; 130:12–16; 131:18–20.)  Similarly, Didlo could not recall whether she spoke to Guidry's superiors when considering him for the team leader position.  (*Id*. at 134:14–17.)

McClarty and Guidry both worked at AES Deepwater for approximately the same numbers of years.  (Doc. 1, ¶6, Doc. 35, Exh. F, ¶ 3–4.)  Like Guidry, McClarty did not have a college degree.  (Doc. 35, Exh. 1.)  McClarty started as an auxiliary operator in 1985 and then became an FGD control room operator and later head operator.  (Doc. 35, Exh. F, ¶ 3–4.)  In September 1987, AES Deepwater promoted McClarty to shift supervisor and, in December 1987, within the first two years of his employment, to FGD team leader.  (*Id*. at 5.)

In June 1988, AES Deepwater transferred McClarty from FGD team leader to relief/training team leader and, in March 1989, he was transferred again to power block team leader.  (*Id*. at 5–6.)  McClarty says that due to a personality conflict with the plant manager, Bill Harshberger ("Harshberger"), AES Deepwater demoted him to water treatment support.  (*Id*. at 7.)  The date of this demotion is absent from the record, and the Court cannot determine when, between March 1989 and September 1993, McClarty's position as power block team leader ended.  (*Id*.)  In September 1993, McClarty returned from water treatment support to control room operator.  (*Id*.)  In 2000, McClarty transferred to the warehouse and in 2001, he assumed the additional role of training coordinator.  (*Id*. at 8–9.)  Whether this latter transfer constituted a

demotion is in dispute.  (Doc. 39 at 3; Doc. 35; Exh. F.)

Didlo testified that from speaking with McClarty she knew he was an operations team leader at one time, although she was unaware of the duration.  (*Id*. at 131:7-20.)  McClarty states that he held FGD, relief/training, and power block team leader positions, but was never an operations team leader.  (Doc. 35, Exh. F at 5–6.)

On April 13, 2007, Didlo chose McClarty as the operations team leader.  (Doc. 35 at 7; Doc. 36, Exh. 1 at 113:12–18.)  Didlo then met with Guidry regarding her decision.  (Doc. 36, Exh. 1 at 151:18–152:13; Exh. 3 at 157:14–20.)  At this meeting, Guidry expressed frustration with the interview process and the treatment he received from Jarvis, his supervisor.  (*Id*.)  Didlo informed Guidry that his support position was being eliminated and suggested he return to the position of FGD operator, a job he had held at AES Deepwater twenty years before.  (Doc. 35 at 8; Doc. 36 at 14.)

On April 24, 2007, one week after hiring McClarty to the operations team leader position, Didlo increased the number of team leader positions from three to four.  (Doc. 35 at 7.)  In addition to McClarty's position as operations team leader, Didlo moved Jarvis laterally to the control room team leader, Bob Shampoe, a white male who had been the power block team leader became the water treatment team leader, and Bill Pogue, a white male who had been an outage manager, became the FGD team leader.  (Doc. 35 at 7–8.)

Guidry left AES Deepwater on June 5, 2007.  (Doc. 35 at 2; Doc. 35 at 8.)  Guidry claims that he was constructively discharged based on AES Deepwater repeatedly denying his promotion to team leader, eliminating his current position, and suggesting he take an entry-level job after over twenty years of service.  (Doc. 1, ¶ 20.)  Guidry says race discrimination was the true reason for denying him promotions given to white candidates and contends that AES

Deepwater benefited from his performing team leader-level work while withholding the salary and benefits associated with that position.  (Doc. 39 at 3–5; Doc. 36, ¶ 29.)

Guidry filed a Charge of Discrimination with the Texas Workforce Commission Civil Rights Division on August 29, 2007.  (Doc. 1, ¶ 5; Doc. 35; Exh. A; Exh. 15.)  On March 28, 2008, the Equal Employment Opportunity Commission ("EEOC") notified Guidry of his Right to Sue.  (*Id*.; Doc. 35; Exh. A; Exh. 17.)  Guidry timely filed this complaint on June 25, 2008, for compensatory damages, including back pay from the date he was denied the 2007 promotion, interest, costs and attorney fees, emotional pain, mental anguish, medical expenses, and loss of earnings and benefits.  (Doc. 1, ¶ 21.)  Guidry also seeks exemplary and punitive damages.  (*Id*., ¶ 22.)

## II.  Legal Standards

### A.  Summary Judgment

A party moving for summary judgment must inform the court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an "absence of a genuine issue of material fact."  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). If the moving party fails to meet its initial burden, the motion must be denied, regardless of the adequacy of any response.  *Little v. Liquid Air Corp.*, 37 F.3d 1069,

1075 (5th Cir. 1994) (*en banc*).  Moreover, if the party moving for summary judgment bears the burden of proof on an issue, either as a plaintiff or as a defendant asserting an affirmative defense, then that party must establish that no dispute of material fact exists regarding all of the essential elements of the claim or defense to warrant judgment in his favor.  *Fontenot v. Upjohn*, 780 F.2d 1190, 1194 (5th Cir. 1986) (the movant with the burden of proof "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor") (emphasis in original).

Once the movant meets its burden, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323–24.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citing *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  Instead, the non-moving party must produce evidence upon which a jury could reasonably base a verdict in its favor.  *Anderson*, 477 U.S. at 248; *see also DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).   To do so, the nonmovant must "go beyond the pleadings and by [its] own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial."  W*ebb v. Cardiothoracic Surgery Assoc. of N. Tex., P.A.*, 139 F.3d 532, 536 (5th Cir. 1998).  Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence.  *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *Grimes v. Tex. Dept. of Mental Health and Mental Retardation*, 102 F.3d 137, 139-40 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (1992), *cert. denied*, 506

U.S. 825 (1992).  Nor are pleadings summary judgment evidence.  *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1046 (5th Cir. 1996) (citing *Little*, 37 F.3d at 1075).  The non-movant cannot discharge his burden by offering vague allegations and legal conclusions.  *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990).  Nor is the court required by Rule 56 to sift through the record in search of evidence to support a party's opposition to summary judgment. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).

Nevertheless, all reasonable inferences must be drawn in favor of the non-moving party. *Matsushita*, 475 U.S. at 587–88; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).  Furthermore, the party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party.  *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198–200 (5th Cir. 1988).  The non-moving party may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue.  *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990).  There is a "genuine" issue of material fact if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that is admissible, though it may not be in admissible form.  *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 80 (5th Cir. 1988).

B. Race Discrimination Claims under Title VII

It is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Guidry's race discrimination claim is based on circumstantial evidence.  Such claims are analyzed under the burden-shifting framework outlined in *McDonnell Douglas v. Green*. 411 U.S. 792 (1973); *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 316 (5th Cir. 2004).  Under this framework, the initial burden lies with the plaintiff to plead a *prima facie* case of employment discrimination.  *Davis*, 383 F.3d at 316.  This burden is one of production and not of persuasion.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000).  To establish a *prima facie* case, the plaintiff must show the following: (1) he was a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by someone outside the protected class, or similarly-situated employees outside the protected class were treated more favorably.  *See Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001) (citing *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999); *Rutherford v. Harris County, Tex.*, 197 F.3d 173, 184 (5th Cir. 1999); *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir. 1982)).  Failure to promote is considered an adverse employment action under *McDonnell Douglas*. *McNealy v. Emerson Elec. Co.*, 121 Fed. Appx. 29, 33 (5th Cir. 2005) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

If the plaintiff establishes a *prima facie* case of discrimination, a presumption of discrimination arises, and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment action.  *See Price v. Fed. Express Corp.*, 283 F.3d 715,

720 (5th Cir. 2002) (citing *McDonnell Douglas*, 411 U.S. at 802). The defendant's burden is satisfied if it produces evidence that "*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *Id.* (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)) (emphasis in original). If the defendant articulates a reason that can support a finding that its actions were nondiscriminatory, "the mandatory inference of discrimination created by the plaintiff's *prima facie* case drops out." *Id.* (citing *Hicks*, 509 U.S. at 510–11). In order to survive summary judgment, the plaintiff must then introduce evidence showing either that (1) defendant's articulated reason was pretextual, or that (2) plaintiff's protected characteristic was a motivating factor in the decision. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (citing *Rishel v. Nationwide Mut. Ins. Co.*, 297 F. Supp. 2d 854, 865 (M.D.N.C. 2003)).

Although the intermediate evidentiary burdens shift back and forth, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143 (quoting *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). In determining whether summary judgment is appropriate, the court considers the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence supporting the employer's case that may properly be considered for summary judgment. *Id.* at 148–49.

III. Discussion

To establish a *prima facie* case of race discrimination, Guidry must show that he (1) was a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was replaced by someone outside the protected class or that similarly-situated employees outside the protected class were treated more favorably. *See*

*Okoye*, 245 F.3d at 512–13.  It is undisputed that Guidry, as an African-American, is a member of a protected class.  Two plant managers stated in depositions that Guidry was qualified to be a team leader, his 2005 performance evaluation said he had potential to be promoted to a team leader position within two years, and Guidry served as an interim team leader on at least four occasions.  In 2007, AES Deepwater denied Guidry's promotion and eliminated his position.  AES Deepwater chose a white candidate to fill the 2007 position, as well as every other team leader position for which Guidry applied.  Therefore, Guidry can establish a *prima facie* case of discrimination.

Guidry's *prima facie* case shifts the burden to AES Deepwater to articulate a legitimate, non-discriminatory reason for choosing McClarty over Guidry to fill the 2007 team leader position.  AES Deepwater states that McClarty was more qualified for the team leader position because (1) McClarty had control room operator experience; (2) McClarty had team leader experience; (3) McClarty had training coordinator experience; and (4) the peer review groups and Didlo independently determined that McClarty was a better fit for the team leader position than Guidry.  (Doc. 36 at 16; Doc. 38 at 7.)

Between his experience at AES Deepwater and another company, McClarty had worked as a control room operator for approximately ten years.  By contrast, Guidry was a relief operator in the control room at AES Deepwater for only one year between 1992 and 1993.  However, Guidry had twenty years of experience in operations at AES Deepwater, including ten years in team leader support positions.  At least one other employee, a white male identified in the record as Ed Pasternack, held the role of FGD support and was subsequently promoted to team leader from that position.  (Doc 36, Exh. 1 at 75–76.)  Further, McClarty had spent the last seven years working in the warehouse and providing intermittent relief to operators.  When asked in her

deposition whether it was a "prerequisite for this position that the person be a control room operator," Didlo said, "No." (Doc. 36, Exh. 3 at 142:25–143:2.)

The duration of McClarty's tenure as team leader is unclear, although it appears to be between two and six years. Guidry had served as an interim team leader on at least four occasions and served in team leader support for ten years. The precise duties of the team leader support position are disputed. Guidry characterized the support role as "work that the team leaders themselves should have been doing and were unable to perform." (Doc. 36, Exh. 1 at 79:23–25.) Didlo testified that "[Jarvis] was supervising and had responsibility for . . . two areas and more people. And . . . that is the reason that [Guidry] was there was to support [Jarvis] so that [Jarvis] could do the team leader things, and [Guidry] could help with the day-to-day stuff." (Doc. 36, Exh. 3 at 42:4–19.)

AES Deepwater's next non-discriminatory reason for promoting McClarty is that McClarty had training coordinator experience. McClarty held this role, in addition to his warehouse duties, for six years. Guidry was also a training coordinator for five years from 1993 through 1998. In fact, Harshberger chose Guidry to be the first training coordinator when the program started. (Doc. 36, Exh. 1 at 69:1–70:6.) As the first training coordinator, Guidry developed the operations and maintenance training programs, including the training manuals and the technical standards and qualification instruments for each operations position in the plant. (*Id*. at 246–249.)

AES Deepwater's last reason for promoting McClarty instead of Guidry is that both the peer review groups and Didlo independently determined that McClarty was a better fit for the team leader position. This appears to be technically true, but important questions remain. Didlo claims that she never considered the evaluations of the peer review groups when making her

hiring decision.  Further, the peer review groups that evaluated Guidry were comprised solely of white employees, after two African-Americans were replaced at the last minute.  Finally, Didlo was aware that Guidry had a history of personality conflicts with Jarvis.  Jarvis nevertheless led the peer review group that evaluated Guidry poorly, and he appears to have been in charge of the overall peer review process.

To survive summary judgment, Guidry must introduce evidence showing either that (1) AES Deepwater's articulated reasons are pretextual, or that (2) Guidry's protected characteristic was a motivating factor in the decision not to promote him.  Guidry disputes that McClarty was more qualified for the team leader position.  *See Beauford v. Sisters of Mercy-Province of Detroit, Inc.* 816 F.2d 1104 (6th Cir. 1987) (holding that jury could have inferred discriminatory intent by maintenance supervisor when he promoted white male to position of boiler room supervisor over black male who was duly licensed boiler operator, where relative qualifications of two candidates presented factual questions as to significance of boiler operator's license and greater seniority possessed by one candidate).  Guidry points to the fact that his peer review groups were comprised exclusively of white interviewers and led by Jarvis.  *See Rowe v. General Motors Corp.*, 457 F.2d 348, 359 (5th Cir. 1972) (noting that "promotion/transfer procedures which depend almost entirely upon the subjective evaluation and favorable recommendation of the immediate foreman are a ready mechanism for discrimination against Blacks").  Guidry also cites Didlo's failure to consider the applicants' qualifications and employment history as well as the absence of any objective criteria for the team leader position.  *See Neely v. Grenada*, 438 F. Supp. 390, 408–9 (N.D. Miss. 1977) (finding evidence of discrimination against Blacks where promotional decisions rested solely with department heads, all of whom were white, and department heads relied solely on their subjective judgment in making promotion decisions).

14 / 15

This evidence, coupled with the fact that AES Deepwater has never promoted an African-American to a team leader position, could lead a reasonable jury to believe that AES Deepwater's non-discriminatory reasons are pretextual and that Didlo, in fact, based her employment decision, at least in part, on race.  (Doc. 39 at 2; Doc. 36 at 3; Exh. 1 at 179:5–7, 216 8–9.)

Summary judgment is inappropriate where "the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) create a reasonable inference that [the protected characteristic] was a determinative factor in the action of which plaintiff complains."  *Vadie v. Miss. State Univ.*, 218 F.3d 365, 373 (5th Cir. 2000), *cert. denied*, 531 U.S. 1113 (2001).  The fact finder must "decide the ultimate question: whether [the] plaintiff has proven [intentional discrimination]."  *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000) (quoting *Hicks*, 509 U.S. at 511–12).  The Court finds material questions of fact remain regarding AES Deepwater's reasons for reasons for not promoting Guidry.

IV.  Conclusion

Accordingly, the Court hereby ORDERS that AES Deepwater's motion for summary judgment (Doc. 35) is DENIED.

SIGNED at Houston, Texas, this 1st day of July, 2010.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE